## UNITED STATES DISCTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

---

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | \| |
| | \| |
| **Plaintiff,** | \| |
| | \| |
| v. | \|  **CIVIL ACTION NO.** |
| | \| |
| Michael K. Molen, | \| |
| Enviro Impact Resources, Inc., | \| |
| f/k/a Industry Source Consulting, Inc., | \|  **JURY TRIAL DEMAND** |
| Seth M. Molen, and | \| |
| Pixel Arcanum, Inc., | \| |
| | \| |
| **Defendants** | \| |

---

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Plaintiff" or

"Commission") alleges as follows:

## SUMMARY OF ACTION

1.      This matter involves federal securities fraud and registration

violations by Defendants Michael K. Molen ("Molen"), Enviro Impact Resources,

Inc., f/k/a Industry Source Consulting, Inc. (OTC Pink symbol: INSO) ("INSO"),

1

Seth M. Molen ("Seth Molen"), and Pixel Arcanum, Inc. ("Pixel"), during various periods from at least 2014 to 2022 (the "relevant period"), as described below.

2.      INSO is, and was during the relevant period, a microcap public company with common stock quoted and traded through an electronic quotation and trading system for over-the-counter (OTC) securities maintained by OTC Markets Group, Inc. (formerly referred to as Pink Sheets) (together with its predecessors, "OTC Markets").

3.      Molen was, for most of the relevant period, INSO's sole officer, sole director and controlling shareholder.  Seth Molen is Molen's son.  Pixel is, and/or was during the relevant period, a Georgia corporation under the collective control of Molen and Seth Molen.

4.      During the relevant period, INSO publicly posted numerous false and misleading quarterly and annual disclosure reports (the "Reports") using a disclosure and news service offered by OTC Markets that is publicly available to the investing public through a website maintained by OTC Markets (the "OTC Markets website"), currently located at www.otcmarkets.com.  Molen prepared, signed, and certified most of these false and misleading Reports during the relevant period, including the false and misleading INSO financial statements contained in such Reports.

2

5.      During the relevant period, INSO also publicly posted, or caused to be publicly posted, certain false and misleading attorney opinion letters relating to INSO's Reports (the "Attorney Letters"), through the OTC Markets website.  Most of these Attorney Letters were posted under Molen's direction.

6.      Among other things, many of these Reports falsely claimed that INSO's financial statements included in the Reports were prepared in accordance with Generally Accepted Accounting Procedures ("GAAP") by someone who had the requisite financial skills.  In truth, Molen prepared most of these financial statements during the relevant period, he had no experience with GAAP, and the financial statements within the Reports violated GAAP in a variety of ways.

7.      Posting these false and misleading Reports and Attorney letters enabled INSO's common stock to be publicly quoted and traded.

8.      In addition, during the relevant period, INSO, Molen, Seth Molen and Pixel made false and misleading statements to brokerage firms, INSO's stock transfer agent, and other third parties, and engaged in other deceptive conduct, to facilitate INSO's and Pixel's fraudulent and unregistered transactions in INSO stock and INSO convertible promissory notes (the "Notes").  Such deceptive conduct included the creation and use of forged documents to further the fraudulent and unregistered transactions.

9.     As  a result of the foregoing conduct, INSO violated Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

10.     As a result of the foregoing conduct, Molen violated Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and aided and abetted violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

11.     As a result of the foregoing conduct, Seth Molen violated Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and aided and abetted violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

12.     As a result of the foregoing conduct, Pixel violated Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)],

Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and aided and abetted violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

<u>**JURISDICTION AND VENUE**</u>

13.    The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, and transactions, acts, practices, and courses of business of similar purport and object; for civil penalties, an officer and director bar and penny stock bar as to certain Defendants; and for other equitable relief.

14.    This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

15.    Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

16.    Defendants, directly and indirectly, made use of the mails, the means and instruments of transportation and communication in interstate commerce and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this Complaint and made use of the mail and the means and instrumentalities of interstate commerce to effect transactions, or to induce or to attempt to induce the purchase or sale of securities alleged in this Complaint.

17.    Certain of the transactions, acts, practices, and courses of business constituting violations of the Securities Act and the Exchange Act occurred in the Northern District of Georgia.  In addition, Molen and Seth Molen currently reside in the Northern District of Georgia, Molen resided in the Northern District of Georgia during all of the relevant period, Pixel was incorporated in the State of Georgia during the relevant period, and Molen directed the operations of INSO from the Northern District of Georgia.

18.    Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged in this Complaint, and in transactions, acts, practices, and courses of business of similar purport and object.

## DEFENDANTS

19.    **Enviro Impact Resources, Inc., f/k/a Industry Source Consulting, Inc.**, is a microcap public company incorporated in Wyoming on June 12, 2010 and based in Georgia during the relevant period, with many former names and businesses and a lengthy corporate history.  During the relevant period, INSO did not file annual or quarterly disclosures with the Commission.  However, INSO publicly posted annual and quarterly Reports, which included unaudited INSO financial statements, through the OTC Markets website.  INSO's common stock is, and was during the relevant period, quoted and traded through an electronic quotation system owned by OTC Markets, and generally traded at less than $0.60 per share.  INSO's "penny" common stock currently trades under the symbol "INSO" in the range of two cents per share.

20.    **Michael K. Molen**, age 66, resides in Berkeley Lake, Georgia.  He was INSO's Chairman of the Board from at least 2007 to March 2021, and an INSO officer from at least 2010 to March 2021.  He was INSO's controlling shareholder from at least 2012 until March 2021, including through his ownership of INSO's one issued share of Series A preferred stock ("Preferred A Stock"), which represented a controlling interest in the company.  In addition, Molen again became INSO's sole officer, sole director, and controlling shareholder from on or

about March 30, 2022 until at least December 15, 2022.  Molen also has been an officer and/or director of other public companies.

21.     **Seth M. Molen**, age 43, is Molen's son.  Seth Molen resides in Berkeley Lake, Georgia, and he resided in Alaska and/or Georgia during the relevant period.  According to INSO's public postings through the OTC Markets website, Seth Molen was an INSO director, Vice President, and employee in 2007.

22.     **Pixel Arcanum, Inc.** is or was a Georgia corporation incorporated on December 16, 2008.  Its corporate registration was administratively dissolved effective September 30, 2021.  Upon information and belief, Molen currently controls Pixel.  Upon information and belief, during the relevant period, Pixel was collectively controlled by Molen and Seth Molen, as described below.

## RELATED PERSON

23.     **Alan A. Tucker** ("Tucker"), age 59, is a resident of Thomasville, Georgia.  In March 2021, Tucker became INSO's sole officer, sole director and controlling shareholder, in connection with Tucker's purchase of one share of INSO Preferred A Stock from Molen.  Approximately one year later, in March 2022, Tucker resigned as INSO's sole officer and director, in connection with Molen's repurchase of the one share of Preferred A Stock.

## FACTS

### Molen's Control of INSO

24.     During the relevant period, INSO had issued and outstanding: (1) one share of Preferred A Stock, the ownership of which constituted a controlling shareholder interest in INSO; and (2) numerous shares of Series B preferred stock ("Preferred B Stock"), which shares were convertible into substantial shares of INSO common stock.

25.      Molen was, for most of the relevant period, INSO's sole officer, sole director and controlling shareholder.  Until March 2021, Molen owned INSO's sole share of Preferred A stock, which constituted a controlling interest in INSO.

26.     On or about February 9, 2021, Molen agreed to sell his share of Preferred A Stock to Tucker.  On or about March 1, 2021, Tucker replaced Molen as INSO's sole officer and director, in connection with Molen's sale of his Preferred A Stock to Tucker effective on or about March 4, 2021.  However, Molen continued to own substantial shares of other INSO stock.

27.     Approximately one year later, on or about March 24, 2022, Molen agreed to repurchase the Preferred A Stock from Tucker.  On or about March 30, 2022, Molen replaced Tucker as INSO's sole officer and director, in connection with Molen's repurchase of the Preferred A Stock effective on or about May 24,

9

2022.  Molen resigned as INSO's chief executive officer and chairman of the board

of directors effective on or about December 15, 2022.

### False and Misleading INSO Reports

28.     During the relevant period, INSO publicly posted over 65 false and

misleading quarterly and annual disclosure Reports through the OTC Markets

website, which contained false and misleading INSO financial statements,

including as described below.

29.     INSO posted the Reports using disclosure templates made available

through OTC Markets and subject to various OTC Markets guidelines for "OTC

Pink" issuers, such as INSO.

30.     By publicly posting these Reports, INSO enhanced the ability of its

shares to trade publicly, in that INSO (1) qualified for the OTC Markets Pink

Current Information Tier as described in OTC Markets guidelines in effect from

time to time during the relevant period; and (2) satisfied certain broker-dealer

requirements that enabled public quoting and trading in INSO's common stock.

31.     OTC Markets guidelines provided, in pertinent part, that to qualify on

an ongoing basis for the OTC Pink Current Information Tier, the issuer was

required to include in its Reports either audited or unaudited financial statements,

which financial statements were required to be prepared in accordance with U.S.

GAAP (or if applicable, an international accounting standard), and prepared in accordance with GAAP by persons with "sufficient financial skills" to do so.

32.    OTC Markets guidelines also provided that, if an issuer's financial statements were not audited by a Public Company Accounting Oversight Board registered audit firm, the issuer was required to publicly post an Attorney Letter relating to the applicable Reports, in order to qualify for the OTC Pink Current Information Tier.

33.    OTC Markets guidelines further provided that Reports must be signed by the issuer's chief executive officer and chief financial officer (or persons with equivalent responsibilities), and contain a certification to the effect that such person had reviewed the Report and, based on such person's knowledge, the Report did not contain any materially false or misleading statement.  The certification must also state that the financial statements and other financial information included in the Report fairly presented in all material respects the financial condition, results of operations, and cash flows of the issuer as of and for the periods presented.

34.    INSO, under Molen's direction, publicly posted over 60 false and misleading Reports from at least 2014 to at least October 2022.  Molen prepared, signed, and certified the Reports.  Additionally, until October 2022, Molen

prepared the false and misleading unaudited financial statements included in the Reports signed by Molen.

35.    INSO, under Tucker's direction, publicly posted eight false and misleading Reports from September to December 2021, which Tucker prepared and/or approved, signed, and certified.  These Reports stated that Tucker prepared the unaudited financial statements included in the Reports.  However, Molen assisted Tucker in the preparation of one or more of the Reports that Tucker ultimately signed, including one or more of the false and misleading financial statements included in such Reports.

**Failure to Comply With GAAP; Lack of Financial Skills**

36.    Among the misrepresentations, INSO falsely and misleadingly represented in certain publicly posted Reports that INSO's financial statements prepared by Molen and ostensibly prepared by Tucker were prepared in accordance with GAAP, and prepared by persons with sufficient financial skills to do so, when neither was true.

37.    On behalf of INSO, Molen certified over 20 Reports for periods ending from 2018 through 2020, falsely stating that the financial statements in the Reports were prepared in accordance with GAAP, while checking a box marked

"U.S. GAAP."  Molen identified himself in the Reports as the person who prepared the financial statements, either by name or as "management."

38.     Molen prepared the unaudited financial statements that were included in INSO's Reports that were publicly posted through the OTC Markets website from at least 2014 to at least 2020.

39.     Molen falsely and misleadingly indicated in the Reports that the financial statements were prepared in accordance with GAAP by persons with sufficient financial skills to do so, when in fact the Reports certified by Molen were not prepared in accordance with GAAP and he lacked such financial skills.

40.      Molen is not a licensed or trained accountant and was not a licensed or trained accountant during the relevant period.  Molen was not a certified public accountant.  Molen did not hire an accountant to assist in preparing INSO's financial statements and Molen had insufficient knowledge of GAAP to prepare INSO's financial statements in accordance with GAAP.

41.     On behalf of INSO, Tucker also certified eight Reports for periods ending in 2020 and 2021, representing that he prepared the financial statements included in the Reports, checking a box marked "U.S. GAAP," and indicating that the financial statements were prepared in accordance with GAAP by persons with

the financial skills to do so.  The Reports certified by Tucker were not prepared in accordance with GAAP.

42.     Tucker lacked the financial skills to prepare the financial statements in accordance with GAAP.  In addition, one or more of the financial statements were actually prepared by Molen, who also lacked such skills.  Among other things, Tucker lacked any formal education, training, or experience as an accountant, he has never held an accounting degree, he had never prepared financial statements for any public company before ostensibly preparing INSO's financial statements, and he did not obtain any accounting advice from an accountant (or other person with sufficient financial skills) in the preparation of any of INSO's financial statements.

43.     In 2022, after Molen replaced Tucker as INSO's sole officer and director, INSO continued to publicly post Reports through OTC Markets that identified Molen as the person who prepared INSO's financial statements, and falsely and misleadingly represented that the financial statements were prepared in accordance with GAAP and by a person with the financial skills to do so.

### Inaccurate Financial Statements

44.     INSO also falsely and misleadingly represented that the financial statements and other financial information contained in INSO's Reports that were

14

publicly posted and in effect from at least 2014 to at least October 2022 "fairly present in all material respects the financial condition, results of operations and cash flows" of INSO as of and for the periods presented, when they did not.

45.    For example, to comply with GAAP, INSO was required accurately to report the total compensation paid to and owed to Molen as of and for the period presented in the Report.  INSO, through Molen, failed to do so.

46.    Molen entered into employment agreements with INSO during the relevant period authorizing an annual salary of $120,000 plus expenses, none of which was disclosed in any applicable Reports.

47.     In addition, INSO bank records and other documents show that Molen used substantial corporate funds for personal purposes and received substantial cash and stock as compensation.  However, INSO's financial statements failed to comply with GAAP in that they did not accurately reflect as an expense the cash amounts that INSO paid to Molen as compensation, nor did the financial statements accurately reflect as a liability the accrued compensation that INSO owed to Molen.

48.    Among other things, INSO collected at least $400,000 in 2019 from several investors for a California hemp project.  Upon information and belief, INSO paid out less than half of that amount purportedly for the project, and Molen

directly or indirectly obtained a substantial portion of the rest, in whole or in part as compensation, without accurate disclosure on INSO's applicable financial statements.

49.     Moreover, during 2019, INSO offered and sold approximately $240,000 of restricted common stock to several investors in private transactions. Molen directly or indirectly obtained at least some of those funds in whole or in part as compensation, without accurate disclosure on INSO's applicable financial statements as required by GAAP.

50.     In addition, Molen failed to comply with GAAP by falsely and misleadingly reporting INSO's key financial information, including INSO's purported assets, liabilities, revenues, and expenses.  In fact, Molen used his estimates and projections of *future* INSO business for unidentified *future* periods, rather than using actual, historical numbers as of and for the periods presented in the Reports.

51.     As a result, contrary to Molen's certifications in the Reports that he signed, INSO's financial statements did not fairly present in all material respects the financial condition, results of operations, and cash flows of INSO as of and for the periods presented in the Reports.

52.     INSO and Molen failed to retain worksheets, calculations, or other documentary support for Molen's purported estimates and projections or for INSO's financial statements.

53.     Moreover, there was an insufficient basis for INSO's untruthful disclosure of its assets, liabilities, revenues, and expenses, even as projected numbers, in its Reports.  For example, under Molen's direction, INSO posted annual Reports with financial statements for 2016, 2017, 2018, and 2019 that disclosed fiscal year end corporate cash balances of $174,983, $180,191, $182,010, and $386,610, respectively. In fact, INSO bank records show that INSO's actual fiscal year end cash balances were only $84, $148, $18, and $4,054, for those periods.

54.     In 2021, after Tucker replaced Molen as INSO's sole officer and director, INSO publicly posted eight Reports signed and certified by Tucker, which failed to comply with GAAP in that the Reports continued to include false and misleading financial statements that were not based on actual, historical numbers as of and for the periods presented in the Reports.  Molen prepared, or assisted in the preparation of, one or more of these Reports and the financial statements included in the Reports.

55.    In 2022, after Molen replaced Tucker as INSO's sole officer and director, INSO continued to publicly post Reports through the OTC Markets website that contained false and misleading financial statements prepared by Molen, because the financial statements were not based on actual, historical numbers as of and for the periods presented in the Reports, as required by GAAP.

**False and Misleading $500,000 License in Reports**

56.    INSO's Reports falsely and misleadingly reported a "license" for software (the "license") as a $500,000 asset on INSO's balance sheet from at least 2014 to July 2022, when INSO had no basis under GAAP for recording or carrying the purported asset at $500,000.

57.    The license comprised at least 45% of the purported value of INSO's reported assets and, for periods from 2020 to 2022, the license comprised approximately 99.8% of the reported assets.

58.    Molen included the license as an asset on INSO's financial statements, even though Molen had no support under GAAP for either the existence of the license, INSO's ownership of the license, or its purported value.

59.    On behalf of INSO, Molen continued falsely and misleadingly to include the $500,000 license in INSO financial statements that Molen prepared or assisted in preparing for Tucker in 2021.

18

60.     In April 2022, after Molen replaced Tucker as INSO's sole officer and director, INSO posted two more Reports under Molen's direction that continued to disclose the license as a $500,000 asset, despite Molen having insufficient evidence of the existence of the license as an asset or its valuation.  The only other reported asset was $971 in cash.

61.     In July 2022, for the first time during the relevant period and after Molen learned that Commission staff were investigating, among other things, the existence of the license, INSO posted two quarterly Reports under Molen's direction, which did not show the license as an asset in the balance sheet. However, INSO, under Molen's direction, failed to present in accordance with GAAP an appropriate corresponding charge in the financial statements and notes thereto disclosing the amount and characterization of the removal of the license.

### False and Misleading Attorney Letters Relating to INSO Reports

62.      During the relevant period, INSO publicly posted, or caused to be publicly posted, certain false and misleading Attorney Letters relating to the INSO Reports, through the OTC Markets website.

63.     By publicly posting, or causing to be publicly posted, such Attorney Letters, INSO, among other things, qualified for the OTC Markets Pink Current

Information Tier, and ultimately enabled public quoting and trading in INSO's common stock.

64.     Under Molen's direction, INSO publicly posted, or caused to be publicly posted, an Attorney Letter dated in 2015, which falsely stated that INSO's financial statements had been prepared and independently audited by INSO's accountant, when INSO did not have an accountant and Molen knew that the financial statements were not independently audited and were actually prepared by Molen.

65.     Under Molen's direction, INSO publicly posted, or caused to be publicly posted, Attorney Letters dated in 2016 and 2017, which falsely stated that INSO's financial statements were prepared by another individual, Accountant A, when Molen knew that he (rather than Accountant A) actually prepared the financial statements.

66.     Under Molen's direction, INSO publicly posted, or caused to be publicly posted, Attorney Letters dated in 2019 and 2020, which stated that Molen was "qualified to prepare financial statements by virtue of his years of experience preparing financial statements for public companies," when Molen knew or was reckless in not knowing that he lacked sufficient qualifications to accurately prepare INSO's financial statements, particularly in accordance with GAAP.

67.    INSO  publicly posted, or caused to be publicly posted, under Tucker's direction: (1) an Attorney Letter dated in 2021, falsely and misleadingly stating that Tucker was qualified to prepare financial statements "by virtue of his years of experience preparing financial statements for public companies," when he had no such experience; and (2) an Attorney Letter dated in 2021, misleadingly stating that Tucker "has more than five years of experience in the preparation of financial reports," when he knew or was reckless in not knowing that he lacked sufficient experience to prepare financial statements for a public company like INSO, particularly in accordance with GAAP.

68.    INSO publicly posted, or caused to be publicly posted, certain Attorney Letters dated in 2020 and in 2022 (under Molen's direction), and two Attorney Letters dated in 2021 (under Tucker's direction), which falsely and misleadingly stated that, after inquiry of management and the directors, neither INSO nor a 5% or more shareholder was under investigation by any regulatory authority for any violation of securities laws.  In fact, Molen and Tucker knew, or were reckless in not knowing, that at a minimum INSO was the focus of an investigation by Commission staff concerning violations of federal securities laws.

21

## Scheme to Distribute INSO Stock to the Public

69.     From at least 2014, INSO, Molen, Seth Molen, and Pixel engaged in a coordinated scheme to evade the federal securities registration requirements in connection with the distribution of INSO stock to the public.

70.     Among other things, Defendants perpetrated the scheme by creating, using and/or delivering, or causing to be delivered, forged documents to brokerage firms, INSO's stock transfer agent, and other third parties that concealed the fact that (a) Pixel and INSO were affiliated entities because they were both under the control of Molen, and (b) Pixel did not pay full consideration when acquiring all of INSO's applicable stock and Notes, as described below.

71.     During the relevant period, Seth Molen held himself out to Pixel's brokerage firms and other third parties as Pixel's sole officer and director in transactions relating to INSO Notes and stock.

72.     However, throughout the relevant period, Molen was also a control person of Pixel.  Among other things:  (1) Molen was a signatory on *all* of Pixel's nine known bank accounts opened from December 2011, and he had access to Pixel bank account statements and funds; (2) Molen signed most of the checks drawn on Pixel bank accounts, withdrew substantial funds from Pixel accounts,

and liberally used Pixel bank debit cards for personal purposes; and (3) for some Pixel bank accounts, Molen was Pixel's *sole* signatory at various times.

73.    In addition, Molen signed several bank records on behalf of Pixel, identifying himself as a Pixel officer, director and/or member, and Molen used his personal address as Pixel's business address.

74.    Furthermore, upon information and belief, more than half of the funds deposited into Pixel bank accounts during the relevant period ultimately were distributed to Molen or for his apparent direct or indirect financial benefit.

75.    During the relevant period, INSO (through Molen) offered and sold to Pixel (through Seth Molen) at least 17 INSO Notes in the total principal amount of approximately $235,500, and at least 75,000 shares of INSO Preferred B Stock with a total subscription price of approximately $50,000, in unregistered transactions.  The INSO Notes and Preferred B Stock were convertible into substantial shares of INSO common stock.

76.    Pixel actually provided to INSO less than half of the purported purchase price of the Notes and Preferred B Stock offered and sold by INSO to Pixel.

77.    Pixel nevertheless submitted over 35 notices of conversion to INSO that were signed by Seth Molen (on behalf of Pixel) and approved by Molen (on

behalf of INSO), in order to convert all or portions of INSO Notes and Preferred B Stock into common stock that ultimately could be traded in the public market.

78.     During the relevant period, Pixel converted most of the INSO Notes and Preferred B Stock into over 1.4 billion shares of INSO common stock.

79.     Pixel (through Seth Molen) then sold most of the INSO common stock in the public market through several brokerage firms, for total gross sales proceeds of over $1.1 million.

80.     Pixel (through Seth Molen) also offered and sold convertible Notes or portions of Notes to third parties.  For example, in November 2020, Pixel sold a 12-month Note to a third party for a purchase price of $25,000, pursuant to an assignment approved by INSO through Molen.

81.     No registration statements were filed with the Commission or in effect with respect to INSO's offers and sales to Pixel, or Pixel's subsequent sales or other dispositions of INSO Notes and stock.  At the time of these unregistered transactions, Molen was a control person of INSO and a *de facto* control person of Pixel.

82.     Pixel and INSO, through Seth Molen and/or Molen, falsely and misleadingly represented to INSO's transfer agent, Pixel's brokerage firms, and Note purchasers that Seth Molen was Pixel's President or other control person,

without disclosing Molen's relationship to Pixel.  Molen's relationship to Pixel, if accurately disclosed, would have rendered unavailable certain potential exemptions from federal securities registration.

83.    For example, on or about May 14, 2018, Seth Molen signed a corporate resolution as Pixel's purported sole officer and sole director, which Pixel delivered to INSO's transfer agent to facilitate the transfer of certain shares of common stock owned by Pixel to several third parties.

84.    Pixel deposited the proceeds from its sales of INSO Notes and stock into Pixel bank accounts over which Molen had either sole control or joint control with Seth Molen.

85.    Deposits to Pixel's bank accounts were derived principally from sales of INSO Notes and stock.

86.    Molen directly or indirectly obtained more than half of the sales proceeds from Pixel's sales of INSO stock and Notes, which were deposited into Pixel's bank accounts.

## Pixel's Deceptive Use of Forged Documents

87.    From at least 2014 to at least 2019, Pixel deceptively used forged documents in over 30 transactions to reflect, falsely, Pixel's payments to INSO in exchange for INSO Notes and stock.

88.     Upon information and belief, Molen and/or Seth Molen created and used these forged documents as described below.

89.     Pixel directly or indirectly delivered the forgeries to INSO's transfer agent, Pixel's brokerage firms, and other third parties, which facilitated Pixel's acquisition and sale of INSO Notes and stock.

90.     As one example of a forgery, in April 2019, Pixel sold a $25,000 INSO Note, dated October 18, 2016, to an associate of Molen, pursuant to an assignment signed by the purchaser, Pixel (by Seth Molen), and INSO (by Molen). To prove the loan, Pixel delivered a forged excerpt of a monthly statement for a Pixel bank account showing a $25,000 wire transfer on October 18, 2016, a previous monthly balance of $34,149.05, and a new monthly balance of $5,610.61. In fact, that bank statement was manually altered.  The actual bank statement instead shows a $750 online transfer to Molen's personal account, a previous monthly balance of $49.05, and a new monthly balance of $1,510.61.

91.     INSO, through Molen, also provided a forged online wire release from an INSO bank account, showing a $25,000 wire from Pixel on October 18, 2016. INSO's actual bank statement shows no such deposit.

92.     As another example of the Defendants' use of forgeries, from August 2017 through September 2018, Pixel, through Seth Molen, submitted eight

conversion notices to INSO to acquire over 146 million shares of INSO common stock by converting portions of Preferred B Stock that Pixel had supposedly purchased for $25,000.  Seth Molen signed the notices of conversion as Pixel's President.  To prove the funding, Pixel delivered or caused to be delivered, to its brokerage firm, forged online screenshots from a Pixel bank account, showing a $25,000 wire from Pixel in 2015 and a "Last Sign On" date in August 2017.  However, upon information and belief, the Pixel bank account was closed in 2012.

93.     In addition, the subscription agreement for the Preferred B Stock and the conversion notices were purportedly approved and signed by a third party individual as President of INSO.  However, upon information and belief, that individual was never INSO's President and his signatures were forged.  None of INSO's applicable Reports, which were certified by Molen, identify the individual as INSO's President.  Moreover, upon information and belief, Seth Molen only submitted Pixel's conversion notices to Molen, and not to the individual identified as INSO's President.

## COUNT I—FRAUD

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

94.     Paragraphs 1 through 93 are hereby re-alleged and are incorporated herein by reference.

95.     From at least 2014 to the present, Defendants, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.  Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

96.     While engaging in the course of conduct described above, Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

97.     By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II—FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

98.     Paragraphs 1 through 93 are hereby re-alleged and are incorporated herein by reference.

99.     From at least 2014 to the present, Defendants, in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

> a.     obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

> b.     engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities,

all as more particularly described above.

100.   By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III—FRAUD

### Violations of Section 10(b) of the Exchange Act
### [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

101.   Paragraphs 1 through 93 are hereby re-alleged and are incorporated herein by reference.

102.   From at least 2014 to the present, Defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

a.     employed devices, schemes, and artifices to defraud;

b.     made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      c.    engaged in acts, practices, and courses of business which would

and did operate as a fraud and deceit upon the purchasers of such

securities,

all as more particularly described above.

103.   Defendants knowingly, intentionally, and/or recklessly engaged in the

aforementioned devices, schemes and artifices to defraud, made untrue statements

of material facts and omitted to state material facts, and engaged in fraudulent acts,

practices and courses of business.  In engaging in such conduct, Defendants acted

with scienter, that is, with an intent to deceive, manipulate or defraud or with a

severe reckless disregard for the truth.

104.   By reason of the foregoing, Defendants, directly and indirectly, have

violated and, unless enjoined, will continue to violate Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R.

§ 240.10b-5].

## <u>COUNT IV—AIDING AND ABETTING</u>

105.   Paragraphs 1 through 93 are hereby re-alleged and are incorporated

herein by reference.

106.   As described above, Defendants violated Sections 17(a)(1), 17(a)(2)

and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2) and

77q(a)(3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78(j)(b)] and

Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

107.   Defendants Molen, Seth Molen and Pixel were aware of, or

recklessly disregarded, that the foregoing conduct was improper and rendered

INSO and each other substantial assistance in this conduct.

108.   By reason of the foregoing, Defendants Molen, Seth Molen and Pixel

aided and abetted, and unless enjoined will continue to aid and abet, violations of

Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C.

§§ 77q(a)(1), 77q(a)(2) and 77q(a)(3)] and Section 10(b) of the Exchange Act [15

U.S.C. § 78(j)(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT V—UNREGISTERED OFFERING OF SECURITIES

**Violations of Sections 5(a) and 5(c) of the Securities Act
[15 U.S.C. §§ 77e(a) and 77e(c)]**

109.   Paragraphs 1 through 93 are hereby re-alleged and are incorporated

herein by reference.

110.   No registration statement has been filed or is in effect with the

Commission pursuant to the Securities Act and no exemption from registration

exists with respect to the transactions described herein.

111.   From at least 2014 to the present, Defendants, singly and in concert,

have:

     (a)     made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

     (b)     carried securities or caused such securities to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or for delivery after sale; and

     (c)     made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy securities, through the use or medium of any prospectus or otherwise,

without a registration statement having been filed with the Commission as to such securities.

112.   By reason of the foregoing, Defendants, directly and indirectly, singly and in concert, have violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Commission respectfully prays for:

### **I.**

Findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that Defendants named herein committed the violations alleged herein.

### **II.**

Permanent injunctions enjoining the Defendants, their officers, agents, servants, employees, and attorneys from violating, directly or indirectly, Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### **III.**

An order pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] prohibiting Defendants Molen and Seth Molen from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the

Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## IV.

An order pursuant to, as applicable, Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)], Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], and the inherent equitable powers of this Court, barring Defendants Molen, Seth Molen and Pixel from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock. A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. § 240.3a51-1].

## V.

An order requiring the disgorgement by the Defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

## VI.

An order pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] imposing civil penalties against the Defendants.

## VII.

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

## **JURY TRIAL DEMAND**

The Commission hereby demands a jury trial as to all issues so triable.

Dated: February 16, 2023

Respectfully submitted,

/s/William P. Hicks
William P. Hicks
Senior Trial Counsel
Georgia Bar No. 351649
hicksw@sec.gov

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov

COUNSEL FOR PLAINTIFF
Securities and Exchange Commission
950 E. Paces Ferry Road N.E.
Suite 900
Atlanta, Georgia 30326-1232
Tel: (404) 842-7600